USD SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 10/5/12

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------
                                    :
JOSEPH VITI,
                                    :       REPORT & RECOMMENDATION
                Plaintiff,
                                    :       10 Civ. 2908 (CM)(MHD)
        -against-
                                    :
THE GUARDIAN LIFE INSURANCE
COMPANY OF AMERICA                  :

                Defendants.         :
------------------------------x

**TO THE HONORABLE COLLEEN McMAHON U.S.D.J.:**


     Plaintiff Joseph Viti brought suit against The Guardian Life
Insurance Company of America to challenge Guardian's denial of his
claim for disability benefits under the insurance plan in which he
participated through his former employer, Sterling Commodities
Corporation. Plaintiff's complaint stated five claims pursuant to
Section 504(a)(1)(B) of the Employee Retirement Income Security Act
of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B).


     Defendant moved to dismiss four of the five claims asserted
against it. Defendant argued that plaintiff's first two claims
regarding denial of benefits were untimely, invoking both the
contractual three-year deadline to file suit after presentation of
the insurance claim and the sixth-month deadline to administratively
appeal the initial denial of the claims. Alternatively, defendant
sought summary judgment on the basis that its denial of the claim
was not arbitrary and capricious. Plaintiff in turn moved for
summary judgment on those two claims, arguing that (1)

"[p]laintiff's mental condition prevented him from filing his appeal by the . . . deadline" and "Guardian's failure to review Mr. Viti's claim because of his inability to comply with the deadline denied Mr. Viti a full and fair [review] of his claim in violation of 29 U.S.C. 1133" (Pl's. Amended Compl. ("Am. Compl.") ¶¶ 44-45); and (2) "Guardian's failure to review Mr. Viti's claim . . . and . . . to consider the reason for his failure to comply with the deadline was a breach of Guardian's fiduciary duty to Mr. Viti in violation of ERISA, 29 U.S.C. section 1104(a)(1)." (Id. at ¶ 47).[1]

Insofar as both parties' motions targeted the denial-of-benefits claim, the district court denied both motions without prejudice. In doing so it concluded that the survival of the first two claims would hinge upon whether the principle of equitable tolling could operate to preserve the timeliness of plaintiff's otherwise temporally-barred complaint. Determining that the record was insufficient to assess the applicability of equitable tolling, the Court referred the case to me for a hearing on this matter. See Viti v. Guardian Life Ins. Co. of Am., 817 F. Supp. 2d 214, 235 (S.D.N.Y. 2011).

---

[1] The District Court dismissed plaintiff's third and fourth claims, which pertained, respectively, to documents that plaintiff alleged defendant had wrongfully withheld, and an ERISA-imposed penalty for such withholding. Id. at 233-34. Plaintiff's fifth claim, which argues that defendant's continuing acceptance of monthly premiums from plaintiff was a breach of fiduciary duty, remains active. Our present recommendation pertains only to the first two causes of action.

We conducted an evidentiary hearing on April 18, 2012 (Hr'g at 1), at which we heard testimony from plaintiff's wife and two sons. We also considered plaintiff's deposition (Dep. Of Joseph L. Viti ("Viti Dep.")).[2] Based on that evidence, we conclude that there is no ground to toll the three-year statute of limitations contractually established by plaintiff's disability plan. Consequently, plaintiff's first and second claims cannot be considered timely. We therefore recommend that his motion for summary judgment be denied and that defendant's motion to dismiss be granted.[3]

We further note that plaintiff failed to delineate the more precise timeline -- the "particularized evidence" -- that the District Court specifically requested in its referring order. <u>See</u> <u>Viti</u> 817 F. Supp. 2d at 231. Instead of months or dates, plaintiff provided only guestimated seasons or years. This uncertainty precludes the fact-specific and time-sensitive showing plaintiff would have to make in order to prevail.

---

[2]    We ruled that the deposition was admissible, following briefing by both sides, on May 4, 2012. (<u>See</u> Order, dated May 12, 2012).

[3]    Technically, since the District court denied both motions without prejudice, no motion is pending. Nonetheless, we deem the parties' respective submissions in connection with our evidentiary hearing to constitute a renewal of their motions.

BACKGROUND

I. Plaintiff's History

   A. Plaintiff Prior to his Disability

Prior to and for several years after the tragic events of September 11, 2001, plaintiff was a successful commodity broker who worked on the trading floor of the Comex Exchange (Viti Dep. 14:6-16:19), where he bought and sold silver, gold and copper. (Id. at 75:10-11). A self-made man (Test. of Stephen Mercurio Viti ("S. Viti Test.") 80:22-81:2), plaintiff had successfully obtained several professional licenses (Viti Dep. 13:12-14) and was a high earner, with an annual salary that reached $300,000. (Test. of Linda Viti ("L. Viti Test.") 61:23-62:3). His dress was "[v]ery proper, very businesslike . . . very citylike," and he was "clean shaved all the time" (Test. of Joseph Viti, Jr. ("J. Viti Test.") 68:4-6), and "always well groomed" because "[h]e took pride in the way he looks." (L. Viti Test. 16:11-13). Plaintiff "always weighed between 175 and 180" (id. at 9:4), regularly slept between seven and a half and eight hours each night (id. at 18:21-22), and ate with a healthy appetite. (Id. at 18:23). He and his wife of thirty years (id. at 4:24-25) had a very active social life and a large circle of friends and family whom they regularly entertained and saw outside their home. (Id. at 21:24-22:5). He "always helped . . . around the house," maintaining the yard and pool and performing essential

4

tasks. (Id. at 28:1-17). He drove himself and the members of his carpool to work daily. (Id. at 11:8-16). Mr. Viti "loved his job." (Id. at 5:22-23).

Plaintiff was at work on September 11, 2001. (Id. at 6:12-13). The Exchange was once housed in the World Trade Center but had moved to a building across the street. (Id. at 6:7-11). Nevertheless, twenty-one brokers who plaintiff knew were inside the World Trade Center that day and were killed in the attack. (Id. at 8:8-14). Plaintiff and his colleagues at the Exchange heard explosions and evacuated their building; one of his friends had a heart attack as they were going down the stairs, and plaintiff saw this friend trampled to death in the panic. (Id. at 7:22-8:7). When plaintiff and his colleagues emerged from their building, they saw people "flying out of the windows" of the Towers (id. at 7:13-16) and "thought they were being bombed" (id. at 7:11), so they "crawl[ed] on the ground under cars." (Id. at 7:3-4). They made their way down to the river and eventually were able to board a boat for New Jersey. (Id. at 7:18-20). Plaintiff arrived home around 8 p.m. that night, dirty and crying. (Id. at 6:14-24). He never spoke much about that day. (Id. at 7:20-21).

Following September 11, 2001, plaintiff began to change. Initially, he said that "he hated going to work because they had to be brought across by military and there [were] a lot of pictures, a lot of families there all the time crying. . . . He said it was

kind of like a ghost town." (Id. at 8:18-24). He gradually "became very, very thin," his weight dropping to "about 130 pounds." (Id. at 9:1-2). He began to have trouble sleeping at night, but slept more during the day (id. at 9:9-11); he also slowly began to withdraw from social activities and to not want to "be anywhere where he was closed in with people." (Id. at 10:11-17).

### B. Plaintiff's Disability

One morning in early October of 2005, plaintiff's wife found him, sitting in his car, which was still parked in their driveway at home at around 7 a.m. (Id. at 11:17-24). When she asked him what he was doing, he said that he was unable to move. (Id. at 11:24-12:3). She eventually had to call their oldest son, who bodily lifted plaintiff from the car and brought him into the house. (Id. at 12:8-14; J. Viti Test. 65:8-66:7).

For several months following this incident, plaintiff remained at home. He cried frequently, slept an unusual amount, and ceased to maintain his appearance. (J. Viti Test. at 17:7-12). He ground his teeth to the point of needing to purchase an entire set of false teeth. (L. Viti Test. at 14:10-14). He did not go to work (id. at 12:14-17) and could only bear to discuss sports or other light topics. (J. Viti Test. at 68:13-18).

6

After months passed without improvement, plaintiff began to see a psychiatrist, Dr. Formento, beginning on February 22, 2006. (Viti Dep. 12:8-13). Although the doctor conducted no formal testing (id. at 25:19-24), he diagnosed plaintiff as suffering from General Anxiety Disorder. Viti, 817 F. Supp. 2d at 219. The doctor prescribed medication for plaintiff and discussed options trading with him. (Viti Dep. at 22:16-23). At the doctor's urging, plaintiff attempted to return to work on occasion from mid-2006 to mid-2007. (Id. at 17:19-22). Although plaintiff's records of his employment during that year were destroyed when Hurricane Irene flooded the basement of his home (id. at 18:21-19:18), Mr. Viti estimates that he went to work twenty days at most during that year. (Id. at 17:28-18:5). Plaintiff also tried, without success, to trade from home via an internet account he had had for years. (Id. at 21:2-6). During that period, plaintiff attempted to go to a mall and to visit his mother. On the first occasion, his wife drove. In response to a traffic jam, plaintiff panicked and fled the vehicle. Similarly, when his son attempted to drive the family to visit plaintiff's mother, plaintiff exited the car when traffic stopped moving on the George Washington Bridge. (See L. Viti Test. 26:8-27:14).

Having become "dissatisfied with the treatment he was receiving from Dr. Formento" in May 2007, Viti began seeing another psychiatrist, Dr. Staniazek in July of that year. Viti, 817 F. Supp. 2d at 219-20. "Although the change in doctors resulted in some improvement, Viti maintains that he continued to suffer from

7

agoraphobia and severe panic attacks." <u>Id.</u> at 220 (citing Pl. Mot. 3.).

Plaintiff remains unable to work. He cannot understand what has happened to him or why (<u>see</u> Viti Dep. 64:12-66:3), but he acknowledges that he has lost the ability to concentrate that was so vital to his job. (<u>See</u> <u>id.</u> at 75:12-77:8). He continues to maintain a driver's license (<u>id.</u> at 63:21-25) but scarcely travels from his house (<u>id.</u> at 63:11-20), and he suffers from ongoing apathy. (<u>See</u> <u>id.</u> at 42:5-15). Plaintiff no longer socializes with friends and does not "bother with" his family. (<u>Id.</u> at 79:15-20). He can make short trips to the pharmacy or the grocery store, but retreats immediately if they are crowded -- he does not like to be surrounded by people, which makes him feel cornered or trapped. (<u>Id.</u> at 79:2-10). When his sons leave the house, he fears for their safety, and "[w]hen they come home, he hugs them like he hasn't seen them in years." (L. Viti Test. 48:23-49:5). Mrs. Viti testified that plaintiff "doesn't deal with stress. He doesn't deal with stress at all . . . He cries and then he has a problem with colitis from stress, so that takes effect. Then he'll go days without eating and he gets very depressed." (<u>Id.</u> at 36:6-16). Plaintiff talks uncontrollably at times (<u>id.</u> at 36:19-25) and at other times, he prays compulsively. (<u>Id.</u> at 24:5-14). When he panics, his condition escalates to the point that "[h]e's almost like a scared animal. He'll attack . . . He's afraid of everything." (<u>Id.</u> at 27:16-19).

8

C. Plaintiff's Disability Claim

As plaintiff's condition persisted, his family and friends urged him to file a disability claim. (Id. at 37:4-13). The claim was filed between June 10 and August 3, 2006. See Viti, 817 F. Supp. 2d at 220. Guardian responded to the filing in a letter dated August 3, 2006, which requested further information. See id. Guardian sent a second request for further information in a letter dated September 13, 2006. (Joint Ex. 8). "Although Viti's response to Guardian's request for additional information was a little late, by September 14, 2006, Guardian had received submissions in response to its August correspondence." Viti, 817 F. Supp. 2d at 220 (citing Pl's. Ex. 1, GL127)). The District Court determined that "the three-year contractual limitations period began to run when [Viti] finalized his submission on September 14, 2006. Three years after September 14, 2006 is September 14, 2009." Viti, 817 F. Supp. 2d at 224.

In a letter dated November 3, 2006, defendant explained that it was denying plaintiff's claim and detailed the procedure for appealing this denial. (Joint Ex. 8). Notably, defendant signaled to plaintiff that an appeal would have to be filed within 180 days of the decision. (Id.). This meant that plaintiff's appeal would come due on May 3, 2007. "Neither Viti nor anyone on his behalf filed an appeal from Guardian's decision by May 3, 2007, which is 180 days from the date of the letter denying his claim." Viti, 817 F. Supp. 2d at 221.

9

In May 2007, plaintiff's wife found defendant's November 2006 denial letter stuck in a drawer of the desk she and her husband share.[4] Mrs. Viti believes that her husband took the letter and that, because he was "unable to deal with the situation" (Joint Ex. 12), "[h]e shoved the letter into his desk unopened." (Compl. ¶ 35).[5] Upon finding the letter, Mrs. Viti contacted an attorney, though in June 2007 the attorney declined to represent the Vitis, instead suggesting that Mrs. Viti contact the company directly. (See Joint Ex. 16; Compl. ¶ 37). Plaintiff's wife wrote a letter dated "6 – __ – 07" to defendant, requesting an extension that would permit her husband to appeal the denial of his claim. (Joint Ex. 12). In a letter dated June 26, 2007, defendant refused to grant this extension. (Joint Ex. 13). "No one -- not Viti or anyone acting on his behalf -- filed any appeal from this decision with a court." Viti, 817 F. Supp. 2d at 221.

---

[4]     There is some confusion regarding the approximate date on which Mrs. Viti found the letter. The complaint alleges that she came upon it while looking for something else "[i]n early May, 2007." (Compl. ¶ 36). In its decision, the District Court treats the letter as having been found "on an unspecified date in 'late May' 2007 -- after the May 3 deadline had passed. . . ." Viti, 817 F. Supp. at 221 (citing Pl's. Ex. 1 (Decl. of Linda Viti dated Sept. 21, 2010) at 41). The evidence at our hearing, in the form of a letter dated May 11, 2007 and sent by an attorney whom Mrs. Viti had contacted, makes unmistakable reference to the letter of denial (Joint Ex. 16), and we may therefore safely conclude that Mrs. Viti found the denial letter by that date at the latest. This determination carries with it important consequences for the applicability of equitable tolling, as we discuss below.

[5]     Plaintiff has no recollection of either receiving or concealing this letter. (See Viti Dep. 53:5-27; 72:18-73:3).

Viti made an application for Social Security Disability Insurance benefits on August 15, 2007. (Opp'n Mem. 16). A decision on plaintiff's claim was made on September 11, 2008. (Pl's. Ex. 1). Administrative Law Judge Joseph M. Hillegas concluded that plaintiff was entitled to SSDI benefits. In his decision,

> [Administrative Law Judge] Hillegas found that Viti, "cannot complete a workday without unscheduled breaks of unreasonable number or duration and cannot respond adequately to work-related stress or changes in an ordinary work routine." However, he also found that Viti "can understand, remember and carry out multi-step instructions of moderate complexity; adapt to change; and adjust to supervision; despite panic attacks."

Viti, 817 F. Supp. 2d at 221 (quoting Pl's. Ex. 3, GL015).

"[I]n November or December 2007," plaintiff and his family retained their current attorney, Robert M. Bach. (L. Viti Test. 50:14-22). Long after his retention, Mr. Bach and defendant exchanged a volley of letters: on October 8, 2009, Mr. Bach requested that defendant allow plaintiff to file a belated appeal (Pl's. Ex. 9); on November 2, 2009, defendant refused. (Pl's. Ex. 10). On January 12, 2010, Bach asked that defendant reconsider its November 2, 2009 decision (Pl's. Ex. 11); on January 21, 2010, defendant replied that it deemed the matter closed. (Pl's. Ex. 12).

II. Procedural History

"On April 5, 2010 Viti filed the original Complaint in this case." Viti, 817 F. Supp. 2d at 222. This filing followed the September 14, 2009 termination of the contractually-fixed limitations period by 205 days. See id. at 224. In August 2010, plaintiff filed an "Amended Complaint [that] contains Five Causes of Action." Id. at 222.

> In the First Cause of Action, Viti alleges that because his "mental condition prevented him from filing his appeal by the May 1, 2007 deadline ... [Viti] should have been permitted by Guardian to file [an] appeal [after the deadline had passed]." Viti further alleges that "Guardian's failure to review Viti's claim because of his inability to comply with the deadline denied Viti a full and fair revue [sic] of his claim in violation of 29 USC 1133."

> In the Second Cause of Action, Viti asserts that "Guardian's failure to review Viti's claim because of his inability to comply with the deadline and its failure to consider the reasons for his failure to comply with the deadline was a breach of Guardian's fiduciary duty to Viti in violation of ERISA, 29 USC section 1104(a)(1).

Id. (alterations in the original) (internal quotations and citations omitted). Plaintiff's third and fourth causes of action allege violations of ERISA. See id. "In the Fifth Cause of Action, Viti asserts that Guardian has violated its fiduciary duty to Viti under 29 U.S.C. § 104(a)(1) because it has continuously accepted monthly premium payments of $165 from Viti since October 2005, when Viti

12

alleges he became disabled." Id. (citation omitted).

Guardian moved to dismiss the complaint on the grounds that it was (1) untimely filed and (2) facially inadequate. In the alternative, defendant sought summary judgment. See id. Plaintiff in turn moved for summary judgment on his first four claims. See id. "Neither party has moved with respect to the Fifth Cause of Action." Id. at 223. In its August 31, 2011 decision, the District Court granted defendant's motion with respect to plaintiff's Third and Fourth Causes of Action, dismissing both with prejudice. Id. at 234.

The Court, however, denied "[a]ll motions by both parties relating to the First and Second Causes of Action . . . without prejudice," and referred the case to me to "conduct a hearing and report . . . on the question of equitable tolling." Id. at 235. "Absent equitable tolling," the Court noted, "Guardian would be entitled to judgment dismissing the first two Causes of Action as time barred for failing to file this lawsuit within three years after the date when plaintiff's claim for benefits was submitted to the insurer." Id. at 218. If plaintiff could show entitlement to an equitable toll of 205 days or more, however, the first two Causes of Action would remain potentially alive and the Court would address the legal issue of whether contractually-stipulated limitations periods are subject to equitable tolling. See id. at 218-19.

13

Observing that a showing of equitable tolling is highly case-specific, id. at 228, the Court directed that the parties create a record sufficient to determine whether equity would mandate that the running of the statute be deemed paused for a period of at least 205 days. Specifically, the Court asked us to address the following issues:

> (1) [W]hether there should be a temporary toll of the statute of limitations for all or some portion of the period beginning November 6, 2006[,] and ending with the discovery of the letter, and (2) if the answer to the first question is yes, on what date should the tolling period end[;]
>
> . . . .
>
> [and (3)] whether any failure to act with reasonable diligence vis a vis Guardian at a time when Viti was asserting his rights as to other matters (specifically SSDI benefits) bars the application of equitable tolling entirely -- even if plaintiff is able to establish fact[s] that might otherwise entitle him to a six[-] or seven[-]month equitable toll.

Id. at 232.

## ANALYSIS

Before turning our attention to the specific issues for which the District Court referred this matter to us, however, we consider the challenges raised by both parties to the time periods defined by the judge's decision. Plaintiff argues that the limitations period should begin later than the District Court found, and defendant contends that the key period in fact ends earlier than the

14

Court assumed. If we adopted either of these positions, this could dispose of this matter or, at the very least, affect our analysis.

We find first that plaintiff's argument for a later date of accrual is unavailing under the law of the case. We then find that evidence brought to light during the evidentiary hearing precludes the 205-day toll that the District Court held to be necessary to preserve plaintiff's claim.

Having found plaintiff's claim to be necessarily time-barred given the impossibility of satisfying the 205-day period that the District Court has ruled to be a mandatory minimum, we then address the issues designated for determination by the Court. We conclude that plaintiff cannot justify equitable tolling with respect to the periods either before or after Mrs. Viti found the letter. Accordingly, we recommend that plaintiff's first two claims be dismissed.

I. Challenges to the Timeline

    A. Plaintiff's Argument for Later Date of Accrual

Plaintiff argues that the letter that defendant sent to plaintiff dated September 13, 2006 (Joint Ex. 8) operates to delay the accrual of plaintiff's cause of action. He asserts that because the letter constitutes evidence that the disability application file

"was not complete on September 14, 2006" (Pl's. Br. 8), his claims based on defendant's denial of benefits accrued either on October 27, 2006 -- the date when the letter specified that the information required to complete the file should be submitted (see id.) -- or on May 2, 2007, "when the right to file an appeal was exhausted because prior to that time the Plaintiff could not bring a lawsuit." (Id. at 10). Plaintiff bases these contentions on the Second Circuit's November 18, 2011 holding in Epstein v. Hartford Life and Accident Ins. Co., 449 F. App'x 46 (2d Cir. 2011), where the Court extended the date on which the cause of action was deemed to have accrued due to the defendant's request for additional information. (See Pl's. Br. 8). Plaintiff suggests that because this assertedly controlling decision postdates the District Court's decision, we must apply Epstein and recalculate the date of accrual. (See id.).

Defendant counters on the bases that (1) "[t]his argument is beyond the mandate of the referral" (Opp'n Mem. 16), and (2) that (2) "Epstein does not apply here because [] Viti's policy contains a different period of limitations." (Id. at 17). We agree with the second argument.

We find that the doctrine of the law of the case applies to the District Court's legal conclusion that plaintiff's cause of action accrued on September 14, 2006. Accordingly, absent a compelling reason to revisit this determination, we will not alter the date of accrual that the Court has previously designated.

16

Where the relevant facts are not in controversy, a court's determination of the date of accrual of a cause of action is purely a question of law. See Biros v. Spalding-Evenflo Co., 934 F.2d 740, 742 (6th Cir. 1991); First Ala. Bank of Montgomery, N.A. v. First State Ins. Co., 899 F.2d 1045, 1055 (11th Cir. 1990); Galindo v. Stoody Co., 793 F.2d 1502, 1508 (9th Cir. 1986). As the District Court noted here, the record reveals that "by September 14, 2006, Guardian had received submissions in response to its August correspondence." Viti, 817 F. Supp.2d at 220 (citing Joint Ex. 9, GL127)). A side-by-side comparison reveals that the letters from Guardian to Viti dated August 3, 2006 (See Joint Ex. 6), and September 13, 2006 (See Joint Ex. 8), respectively, are materially identical. Accordingly, in tendering the requested documents on September 14, 2006, plaintiff simultaneously satisfied the requirements of both letters. Plaintiff provides no evidence that defendant either requested or received additional information between September 14, 2006, and its denial of plaintiff's claim on November 3, 2006 -- indeed, these are some of the facts that Judge McMahon described as "undisputed and indisputable." Viti, 817 F. Supp. 2d at 230. This suggests that, as of plaintiff's September 14 proffer of information, the proof of loss was sufficient to allow defendant to dispose of the claim. Because there is no fact-based controversy surrounding the date of accrual stated by the District Court, its determination is a legal one that triggers the doctrine of the law of the case.

17

"[A]s most commonly defined, the [law of the case] doctrine
posits that when a court decides upon a rule of law, that decision
should continue to govern the same issues in subsequent stages in
the same case." <u>Pepper v. United States</u>, 131 S. Ct. 1229, 1250,
(2011) (quotations omitted). More specifically, "[t]he law of the
case doctrine 'commands that when a court has ruled on an issue,
that decision should generally be adhered to by that court in
subsequent stages in the same case,' unless there has been 'an
intervening change in law, availability of new evidence, or the need
to correct a clear error or prevent a manifest injustice.'" <u>Thompson
v. Choinski</u>, 374 F. App'x 222, 223 (2d Cir. 2010) (quoting <u>Johnson
v. Holder</u>, 564 F.3d 95, 99-100 (2d Cir. 2009) (internal quotation
marks omitted)). Indeed, "[a]lthough [the law-of-the-case] doctrine
does not restrict a court's authority to revisit a previously
decided issue, 'courts should be loathe to do so in the absence of
extraordinary circumstances, such as where the initial decision was
clearly erroneous and would work a manifest injustice.'" <u>Wash. Nat.
Life Ins. Co. of N.Y. v. Morgan Stanley & Co.</u>, 974 F. Supp. 214, 218
(S.D.N.Y. 1997) (quoting <u>Christianson v. Colt Indus. Operating
Corp.</u>, 486 U.S. 800, 817 (1988) (quotations omitted)).

Here, plaintiff does not allege clear error by the District
Court or the availability of new evidence. Plaintiff argues, rather,
that the Second Circuit's decision in <u>Epstein</u> constitutes "an
intervening change in the law." For the <u>Epstein</u> decision to mandate
the drastic step of deviating from the District Court's legal

18

finding with respect to the date of accrual, that case would need to address as part of its main holding precisely the matter at hand in the present case -- dicta and tangential determinations do not warrant such disruption. See, e.g., Russul Corp. v. Zim Am. Integrated Shipping Servs. Co., 2009 WL 3247141, at *4 (S.D.N.Y. Oct. 5, 2009) (citations omitted) ("[T]he law of the case doctrine does not apply to dicta, but only a prior court's rulings of law."); Milgard Tempering, Inc. v. Selas Corp. of Am., 902 F.2d 703, 715 (9th Cir. 1990) ("A significant corollary to the [law-of-the-case] doctrine is that dicta have no preclusive effect."); see also Cohen v. Brown Univ., 101 F.3d 155, 181 (1st Cir. 1996) (rejecting an attempt to depart from the law of the case when the "intervening controlling authority . . . does make new law, [but] the law it makes is wholly irrelevant to the disposition of this appeal").

For a later decision to unsettle a previous determination, overlap is not enough -- the former must be patently inconsistent with the latter. See, e.g., United States v. Van Alstyne, 584 F.3d 803, 813 (9th Cir. 2009) (noting that a subsequent case "represents precisely the type of intervening change that the law of the case exception recognizes" when it dictated a new definition of a statute that was "inconsistent" with the preceding definition employed).

Epstein neither coincides with nor contradicts the District Court's determination clearly enough to warrant deviation from the law of the case established by the District Court's finding. In

19

Epstein, plaintiff was formally denied physical-disability benefits and granted mental-health benefits. 449 F. App'x at 48. Several months after its initial denial, the defendant insurer in that case wrote to the plaintiff and "asked Epstein to provide additional information regarding his physical disabilities so that Hartford could determine whether Epstein was eligible for long-term physical-disability benefits to begin on October 22, 2007, after his two years of mental-health benefits ended." Id. "At oral argument, [the defendant] admitted that its post-denial requests for additional information regarding Epstein's long-term physical disabilities would have restarted the running of the limitations period if Epstein had replied and furnished the information that [defendant] requested." Id. at 49. The defendant argued that because plaintiff did not respond, it should not receive leniency. See id. The Second Circuit held, however, that the plaintiff's lack of responsiveness did not affect the statute of limitations, which was re-launched by the defendant's request. The court framed its holding very narrowly: "Having conducted a de novo review of the record, we conclude that [the defendant's] post-denial request for additional proof of loss regarding Epstein's claim for long-term physical disability benefits extended the limitations period to run from December 20, 2006, when such proof of loss was due." Id. (emphasis added).

    In striking contrast, in this case defendant's September 13 request for further information did not follow its denial. On the contrary, it is not, technically speaking, a request for further

information, but rather a further request for the same information that Guardian had sought in August, as a comparison of the materially identical letters included in the record reveal. Compare Joint Ex. 6 with Joint Ex. 8). Moreover, plaintiff complied with that request by September 14, 2006, thus completing the process of presenting his claim.

In short, the cases are factually distinguishable in ways important enough to make it impossible to conclude that the narrow Epstein holding renders Judge McMahon's determination erroneous or to warrant disregard of the law of the case. Furthermore, for reasons enumerated below, even if we assumed arguendo that Epstein dictated that the three-year deadline ran until October 27, 2006, there would be no basis to involve equitable tolling here.[6]

B.   Defendant's Argument that New Evidence Reveals the Maximum Tollable Period to be 186 Days

The District Court found that, in order for this case to be timely, plaintiff would need to show "that he was entitled to a temporary toll of the limitations period that lasted more than 205 days." Viti, 817 F. Supp. 2d at 231. Such a toll would be needed to cure the 205-day period by which plaintiff's date of filing the lawsuit -- April 5, 2010 -- exceeds the contractually-stipulated

_____

[6] Plaintiff's alternative argument that the claim should not be deemed to have accrued until May 2007 is barred by law of the case, and he fails to suggest any basis to revisit the District Court's rulings, which are inconsistent with this theory.

limitations period according to which suit would have to have been filed on September 14, 2009, three years from the date plaintiff's cause of action accrued. See id. at 226. The District Court further found that the only period that could possibly be eligible for equitable tolling is the "period [that] runs roughly from November 6, 2006," the date by when plaintiff is presumed to have received the letter of denial from defendant, "through the unspecified date in 'late May 2007' when Mrs. Viti found the letter", because "[o]bviously, once the letter was found, any excuse for inaction melts away . . ." (Id. at 231-32).

Clearly, the date upon which the letter was found is crucial -- the maximum tolled period that plaintiff could establish, if the letter were found on May 31, 2007, would be 207 days. It follows that if the letter were found earlier than May 29, 2007, any possible toll would fall shy of the 205-day requirement recognized by the District Court. The "late May" figure would have to fall very late in May, indeed, in order to enable plaintiff to make a case for equitable tolling.

Given the specificity of both the minimum time period plaintiff would need to demonstrate and the maximum eligible window of time available, defendant correctly signals that a letter entered in evidence during the hearing essentially precludes plaintiff from making the temporal showing necessary to his case. (Opp'n Mem.7-8).

22

Joint Exhibit 16 is a letter sent by Bonny Rafel, Esq., a lawyer based in Livingston, New Jersey, to plaintiff. It bears the subject line "Your Disability Claim" and is dated "May 11, 2007." It reads in relevant part:

> Thank you for contacting my office with respect to your disability claim with Guardian Insurance Company. You have contacted us regarding a <u>denial</u> of disability benefits, and there were deadlines for the filing of an appeal. Based on the information in the letter you provided, Guardian claims that ERISA applies and your deadline would have run out in early May.

(Joint Ex. 16) (emphasis in original). Even if we assume that Ms. Rafel responded on the very date on which she received word from plaintiff, the latest date on which plaintiff or his wife could have become aware of Guardian's denial letter -- clearly referenced above -- is May 11, 2007, or 186 days after the letter was sent.

Because this 186-day period is manifestly inadequate to meet the requisite 205-day minimum, under the findings made by the District Court, plaintiff's case is untimely notwithstanding the maximum toll that might be applied. Nevertheless, it would be imprudent not to explore the applicability of equitable tolling on the merits, lest the District Court revisit the limitations period in response to plaintiff's <u>Epstein</u>-based arguments. For the sake of thoroughness, therefore, we explore whether plaintiff's circumstances clear the extremely high hurdle posed by the pre-

23

conditions for invoking the doctrine of equitable tolling.

## II. Equitable Tolling

### A. Legal Standard for Equitable Tolling

"The rationale behind the doctrine of equitable tolling 'is that a statute of limitations does not run against a plaintiff who is unaware of his cause of action.'" Yesh Diamonds, Inc. v. Yashaya, 2010 WL 3851993, at *2 (E.D.N.Y. Sept. 27, 2010) (quoting Cerbone v. Int'l Ladies' Garment Workers' Union, 768 F.2d 45, 48 (2d Cir. 1985)). "The doctrine of equitable tolling is applied 'as a matter of fairness' where a plaintiff has been 'prevented in some extraordinary way from exercising his rights . . .'" Smith v. N.Y.C. Dep't of Corr., 2010 WL 5298013, at *2 (S.D.N.Y. Dec. 21, 2010) (quoting Johnson v. Nyack Hosp., 86 F.3d 8, 12 (2d Cir. 1996) (internal quotations omitted)). "Under the doctrine of equitable tolling, a court may, under compelling circumstances, make narrow exceptions to the statute of limitations in order 'to prevent inequity.'" Yesh Diamonds, 2010 WL 3851993, at *2 (quoting In re U.S. Lines, Inc., 318 F.3d 432, 436 (2d Cir. 2003) (internal quotations omitted)). That the doctrine is to be employed only sparingly -- in "extraordinary" and "compelling" circumstances -- is reflected in the fact that the plaintiff bears the burden of persuasion to show that tolling is justified. See, e.g., Boos v. Runyon, 201 F.3d 178, 185 (2d Cir. 2000). "Uncertainty works to the

24

disadvantage of the party on whom the law places the burden of proof." Rios v. Mazzuca, 78 F. App'x 742, 745 (2d Cir. 2003).

Like the First, Sixth, Seventh, Ninth and D.C. Circuits, the Second Circuit has recognized mental incapacity as a potentially valid justification for equitably tolling a statute of limitations. See Zerilli-Edelglass v. N.Y.C. Transit Auth., 333 F.3d 74, 80 (2d Cir. 2003) ("where a plaintiff's medical condition or mental impairment prevented her from proceeding in a timely fashion," equitable tolling may be appropriate); see also Barrett v. Principi, 363 F.3d 1316, 1319 (Fed. Cir. 2004). While the Second Circuit has acknowledged the possibility that mental incapacity might militate in favor of equitable tolling under ERISA, see Chapman v. ChoiceCare Long Island Term Disability Plan, 288 F.3d 506, 514 (2d Cir. 2002), it has also held that tolling is by no means automatic or obligatory. Rather, "[t]he issue of whether a mental disability warrants equitable tolling of a filing deadline requires a 'highly case-specific' inquiry." Brown v. Parkchester S. Condos., 287 F.3d 58, 60 (2d Cir. 2002) (quoting Boos, 201 F.3d at 184).

Generally, a late-filing party seeking equitable tolling must satisfy two requirements. First, he must demonstrate that "extraordinary circumstances" prevented him from filing on time. See Bolarinwa v. Williams, 593 F.3d 226, 231 (2d Cir. 2010); Smith v. McGinnis, 208 F.3d 13, 17 (2d Cir. 2000) (citing Johnson v. Nyack Hosp., 86 F.3d 8, 12 (2d Cir. 1996)). As this formulation implies,

25

the plaintiff must demonstrate both the existence of extraordinary circumstances and a "causal relationship between the extraordinary circumstances on which the claim for equitable tolling rests and the lateness of [the] filing." Valverde v. Stinson, 224 F.3d 129, 134 (2d Cir. 2000). The Second Circuit has recently stressed that the word "extraordinary" should not be read down by courts, but rather given its full force: "As a general matter, we set a high bar to deem circumstances sufficiently 'extraordinary' to warrant equitable tolling." Dillon v. Conway, 642 F.3d 358, 363 (2d Cir. 2011).

Second, the party must have acted with "reasonable diligence" in pursuing his or her application during the period he or she seeks to toll. Johnson, 86 F.3d at 12.[7] "The diligence required for equitable tolling purposes is reasonable diligence, . . . not maximum feasible diligence." Holland v. Florida, 130 S. Ct. 2549, 2565 (2010) (internal citations and quotations omitted). Nevertheless, "equity is not intended for those who sleep on their rights." Iavorski v. U.S. I.N.S., 232 F.3d 124, 134 (2d Cir. 2000) (quoting Covey v. Ark. River Co., 865 F.2d 660, 662 (5th Cir. 1989). This diligence must include an attempt to file promptly after the extraordinary circumstances began. See Valverde, 224 F.3d at 134.

---

[7]   Parties seeking equitable tolling must make a showing of reasonable diligence not only throughout the period to be tolled but also throughout the rest of the limitations period. Because the District Court has presented the question of ongoing diligence as a separate issue, we have accordingly bisected our reasonable diligence analysis. See pp. 35-38 infra, for a discussion of post-tolling diligence.

When equitable tolling is sought in response to alleged mental incompetence, courts must weigh certain other considerations as well. First, an ongoing condition cannot, in and of itself, serve as "extraordinary circumstances." Rather, a party seeking tolling must in some way distinguish the period to be tolled from the time surrounding it via a particularized evidentiary showing. See Boos, 201 F.3d at 185 (holding that a more specific showing than that the plaintiff suffers from "paranoia, panic attacks, and depression" would be warranted to successfully establish circumstances sufficiently extraordinary to invoke equitable tolling). Second, and particularly relevant in the present case, is the legal principle known as the voluntary assumption of duty, according to which "one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully," and a key factor that can convert action into duty is reliance on the part of the injured party. Bartolotta v. Liberty Mut. Ins. Co., 411 F.2d 115, 119 (2d Cir. 1969) (citing Restatement (Second) of Torts § 323 (1965)). In the case of those who undertake to protect the rights of mentally incompetent individuals, such succor easily creates reliance and, with it, a duty to act. See, e.g., Bd. of Trs. of Equity League Pension Trust Fund v. Royce, 238 F.3d 177, 182 (2d Cir. 2001).

B. <u>Plaintiff is not Entitled to Equitable Tolling</u>

1. <u>Extraordinary Circumstances Before and After the</u>
   <u>Denial Letter Was Found</u>

Circumstances that courts have found to rise to the level of "extraordinariness" required by the equitable tolling standard include the filing of a deficient pleading within the statute of limitations, lack of awareness of a cause of action resulting from deceptive practices by the other party, and "where plaintiff's mental or physical condition prevented [him or] her from filing within the time limit." <u>Johnson v. St. Barnabas Nursing Home</u>, 588 F. Supp. 2d 465, 469 (S.D.N.Y. 2008) (citing <u>Nyack Hosp.</u>, 86 F.3d at 12). For plaintiff to show that his medical condition warrants tolling the statute, he must "[a]t a minimum . . . provide 'a particularized description of how [his] condition adversely affected [his] capacity to function generally or in relationship to the pursuit of [his] rights.'" <u>Rios</u>, 78 F. App'x at 744 (quoting <u>Boos</u>, 201 F.3d at 185). Plaintiff is unable to make this showing.

Plaintiff's case does not fail because the court in any way doubts that "Viti was and remains mentally ill, or that he is unable to work." <u>Viti</u>, 817 F. Supp. 2d at 230. Unlike the plaintiff in <u>Moyer v. IBM Corp.</u>, 2003 WL 256931, at *2 (S.D.N.Y. Feb. 3, 2003), whose implausible allegations that frequencies used by his former employer tampered with his brain and left him unable to file suit within the limitations period warranted no equitable toll, there is

28

no question that Mr. Viti's continuing disability is genuine. Rather, as the District Court signaled, "[t]he issue is whether [plaintiff] was so utterly disabled as to be effectively incapable of protecting his rights." Id. Indeed, indicia that plaintiff "was able, with the assistance of his wife and counsel, to pursue his legal rights . . . is enough, in and of itself, to disentitle him to equitable tolling." Id.

Having held that the discovery of the letter served as incontrovertible notice to plaintiff's wife of defendant's denial of her husband's claim, the court opined that plaintiff would have to demonstrate that extraordinary circumstances prevented him from acting on his own behalf in order to make a case for equitable tolling. See Viti, 817 F. Supp. 2d at 231-32. Plaintiff, in other words, would need to distinguish the period beginning in November 2006 and ending by May 11, 2007, from the period beginning May 12, 2007, which is ineligible for tolling for want of extraordinary circumstances. See id. Plaintiff fails to do so.

Plaintiff's condition during the November 2006-May 2007 period was severe enough to preclude him from returning to work or, indeed, spending much time outside his home. (See Viti Dep. At 17:19-18:5). His condition did not improve substantially after this period; on the contrary, plaintiff remains to this day unable to work and, largely, to leave his house. (See, e.g., id. at 79:2-20). Nevertheless -- and without any marked signs of improvement --

29

plaintiff was able, apparently with his wife's assistance, to pursue Social Security benefits and, ultimately, to file this complaint. (See id. at 220-22). Joseph Viti testified that from March 2007 to September 2007, his father's situation "really wasn't that different" from what had passed before. (See J. Viti Test. 68:19-69:12). Similarly, in reference to the period from July 2008 to December 2008, plaintiff's son testified that plaintiff "was not getting better;" rather, "it was pretty much the same." (Id. at 71:18-72:15). According to this testimony, plaintiff's social security application, filed in August 2007 (see Opp'n Mem. 16), was filed during a period indistinguishable from the period that preceded or followed it.

The fact that plaintiff was later able to take measures to protect his legal rights despite suffering the same afflictions that he bore during the relevant period defeats his characterization of that period as extraordinary. In Jones v. N.Y. Dep't of Corr. (DOC) Jail, 2012 WL 1232963, at *2 (S.D.N.Y. Apr. 12, 2012), this court rejected the plaintiff's claim that his bipolar disorder rose to the level of an extraordinary circumstance that would warrant equitable tolling because the plaintiff was (1) on medication and (2) unable to show "how any such impairment was alleviated . . . when [he] filed the instant action." See also Rios, 78 F. App'x at 744-45 (holding that though plaintiff was unquestionably incompetent during portions of the limitation period, there were other times at which he was sufficiently lucid to protect his rights and so was not

30

entitled to equitable tolling of the entire limitations period, especially given that plaintiff did not argue that his condition abated or even improved prior to his filing).

In short, plaintiff has offered no evidence that materially distinguishes the relevant period from the time that follows, during which he was able, through the intermediary of his wife, to protect his rights. As a result, his incompetency must be deemed ongoing and, "where a petitioner has filed other pleadings during the alleged period of incompetency, courts are often unwilling to find equitable tolling appropriate." Robison v. Hinkle, 610 F. Supp. 2d 533, 540 (E.D. Va. 2009) (collecting decisions from several circuits in support of this principle).

### 2. Reasonable Diligence

Even if we were to find, against the weight of evidence, that plaintiff's circumstances were "extraordinary" as defined in the context of equitable tolling, he still must show that he acted with reasonable diligence with respect to his legal rights and claims. He fails to do so.

It is a well-settled principle that mental infirmity is, in and of itself, an insufficient ground upon which to extend a statute of limitations. See Barren v. United States, 839 F.2d 987, 992 (3d Cir. 1988) (gathering cases). Indeed, courts have consistently required

31

that even mentally incompetent persons demonstrate that they sought to pursue the legal rights available to them with reasonable diligence, with due regard for their condition. See, e.g., Davis v. N.Y.C. Transit Auth., 73 F. App'x 524, 525 (2d Cir. 2003) ("[W]here a plaintiff's medical condition or mental impairment prevent[s][him] from proceeding in a timely fashion, [tolling] is only appropriate if the plaintiff has acted with reasonable diligence <u>during the time period [he] seeks to have tolled</u>." (internal quotation omitted) (emphasis added).

### i. The Period between the Receipt and the Discovery of the Letter of Denial

"When determining whether equitable tolling is applicable, a district court must consider whether the person seeking application of the equitable tolling doctrine . . . has 'acted with reasonable diligence during the time period [he or] she seeks to have tolled.'", <u>Zerilli-Edelglass</u>, 333 F.3d at 80-81 (quoting <u>Chapman</u>, 288 F.3d at 512). Because the efforts made subsequent to discovery of the letter -- contacting two attorneys (L. Viti Test. 41:18-23; 50:14-22); writing to defendant to ask for an extension -- do not suffice to show reasonable diligence with respect to the pre-discovery period at issue in the present case, we must comb the relevant period for signs of reasonable diligence.

The fact that the letter was sitting, unopened (L. Viti Test. 41:13-17), in a drawer of the desk shared by plaintiff and his wife (<u>id.</u> at 38:2-19) necessarily suggests a lack of diligence. In

32

declining to toll 42 U.S.C.§ 405(g), the court in <u>Bender v. Astrue</u>, 2010 WL 3394264, at *1 (E.D.N.Y. Aug. 23, 2010), cited circumstances under which courts within the Second Circuit have tolled the SSA:

> [T]he claimant in <u>Hernandez v. Barnhart</u> <u>filed a new application during the limitations</u> <u>period instead of filing a complaint with the</u> <u>court</u> despite "significant impairments, including illiteracy and mental retardation," in addition to being solely Spanish-speaking. <u>Hernandez v. Barnhart</u>, 2004 U.S. Dist. LEXIS 3404, at *4, *18 (S.D.N.Y. Mar. 4, 2004), adopted by 2004 U.S. Dist. LEXIS 5818 (S.D.N.Y., Apr. 6, 2004). In <u>Hernandez</u>, the court also found that the complainant was "incapacitated during the relevant limitations period," which may have prevented her from pursuing judicial review. <u>Id.</u> at *18. Yet, within a matter of months, claimant sought and obtained legal counsel, and ultimately filed a complaint on the same day that she first met with counsel, approximately five months after the deadline. <u>Id.</u> at *5.
>
> Similarly, in <u>Rodriguez v. Barnhart</u>, claimant suffered from depression, mild mental retardation, and possibly more significant mental impairments. <u>Rodriguez v. Barnhart</u>, 2002 WL 31875406, at *4 (S.D.N.Y. Dec. 24, 2002). However, the claimant managed to contact the court's Pro Se Office <u>within the limitations</u> <u>period</u> to request the necessary forms, and ultimately submitted her complaint just thirty-two days after the deadline, thereby raising a "colorable claim" for equitable tolling and requiring an evidentiary hearing. <u>Id.</u> at *1, 4-6. . . .

<u>Bender</u>, 2010 WL 3394264, at *5-6 (emphasis added). As these cases reveal, to demonstrate reasonable diligence requires a showing of attempted self-preservation -- mental incapacity notwithstanding -- <u>during</u> the period to be tolled: in <u>Rodriguez</u>, the plaintiff contacted the <u>Pro Se</u> Office; in <u>Hernandez</u>, the plaintiff mistakenly

33

filed an application rather than a form.

Even if we relax the reasonable-diligence standard sufficiently to require no efforts to preserve one's rights at times of psychological incompetence, however, plaintiff's own incapacity would not suffice to excuse inaction on the part of his wife, who would also have needed to exercise reasonable diligence in seeking to enforce her husband's rights. "[T]he regulation [in which ERISA is codified] provides that if 'the spouse is legally incompetent to give consent, the spouse's legal guardian, even if the guardian is the participant, may give consent.'" Bd. of Trs. of Equity League Pension Trust Fund v. Royce, 238 F.3d 177, 182 (2d Cir. 2011) (quoting 26 C.F.R. § 1.491(a)-20, A-27). More specifically, a wife's failure to seek updates regarding her husband's court motion has been deemed to reveal a lack of the reasonable diligence necessary to toll a statute of limitations. See United States v. Saenz-Lopez, 2010 WL 4282166, at *4 (N.D. Tex. Sept. 8, 2010) report and recommendation adopted, 2010 WL 4340246 (N.D. Tex. Oct. 28, 2010).

Here, Mrs. Viti was aware that plaintiff had disability insurance. (L. Viti Test. at 39:2-7). She also knew that he had "put in an application for the benefit" (id. at 39:8-10) because she completed the application in its entirety on behalf of her husband. (See id. at 39:15-17; 40:12-15 (plaintiff "couldn't fill it out by himself.")). In the letter dated September 13, 2006, in which defendant requested further information from plaintiff, it states:

34

> Guardian will have 30 days from the date we
> receive the [requested] information to decide
> your claim.
>
> If a complete response is not received by
> within [sic] 45 days[,] by October 27, 2006,
> your claim will be reviewed with the current
> information on file and you will be notified of
> our    decision    in    writing.    Insufficient
> information may result in the denial of your
> claim.
>
> We will continue to make every effort to
> facilitate a prompt and fair decision while
> keeping you informed in the process. If you
> have any questions, or would like to discuss
> your claim further, please contact me directly
> at [this phone number].

(Joint Ex. 8). This letter of unquestionable clarity stresses
timeliness, solicits questions and, above all, furnishes a date by
which plaintiff could expect word of a decision, even in the absence
of further information. Plaintiff, through his wife, was thus on
constructive notice that Guardian would make a decision with respect
to the claim by November 27, 2006, at the latest. The failure by
both Mr. Viti and his wife to make any inquiry with respect to
plaintiff's claim when Guardian's deadline came and passed -- by
over five months -- constitutes a failure to exercise the reasonable
diligence required to warrant equitable tolling.


### ii. The Remainder of the Three-Year Limitation Period


The District Court invited a report on an additional issue,
namely "whether any failure to act with reasonable diligence vis a
vis Guardian at a time when Viti was asserting his rights as to

35

other matters (specifically SSDI benefits) bars the application of equitable tolling entirely." <u>Viti</u>, 817 F. Supp. at 232. Such a lack of diligence would necessitate dismissal of the claim "even if plaintiff is able to establish facts that might otherwise entitle him to a six or seven month equitable toll." <u>Id.</u> Indeed, this inquiry is of paramount importance here because, "[i]n a case where the alleged extraordinary circumstances ceased early in the limitations period, we inquire whether the petitioner diligently pursued his application in the time remaining." <u>Hizbullahankhamon v. Walker</u>, 255 F.3d 65, 75 (2d Cir. 2001).

In referring this issue to us, the District Court made it clear that a showing of reasonable diligence would require plaintiff to furnish a "particularized reason why he or someone acting on his behalf could not have commenced this lawsuit much, much sooner than they did . . . " <u>Viti</u>, 817 F. Supp. 2d at 232. In this regard, the Court observed that plaintiff had undertaken several steps to pursue various of his rights after the denial letter surfaced: "Guardian was asked to waive the 180 period for filing an appeal and refused to do so; plaintiff applied for SSDI benefits and was awarded those benefits; plaintiff hired an attorney to try to resurrect the Guardian claim." <u>Id.</u> Having noted that "there is considerable evidence that plaintiff did not act with reasonable diligence with respect to Guardian's denial of benefits," <u>id.</u>, the Court implicitly ruled that to be granted equitable tolling, plaintiff would need to present some compelling explanation for the delays involved with

36

respect to this case, namely: "[t]he fact that plaintiff (or his wife) did not hire an attorney sooner, or that they did not choose to deal with Guardian's denial of benefits until the autumn of 2009," id., particularly when "[p]laintiff's moving papers suggest no reason why the Guardian issue could not have been brought to court during the 2007 - 2008 period while plaintiff was applying for his SSDI benefits." Id.

Plaintiff offers only one argument (and no evidence) in his effort to distinguish the present claim -- which he did not pursue with diligence -- from his SSDI case, which he did diligently pursue: "[I]t is impossible to prosecute a case in a vacuum." (Pl's. Mem. 13). Plaintiff asserts that two major gaps in the record prevented him from proceeding more swiftly against defendant: the delay in obtaining medical records from Dr. Formento, a process that took over a year and required plaintiff's attorney "to file a complaint with the New Jersey Medical Board" (id. at 12), and the impossibility of obtaining "fundamental details in the case that had to be answered" regarding commodities trading, which "is complicated." (Id. at 13).[8]

This purported explanation is ultimately unavailing. With regard to the supposedly "vital details," plaintiff has since

---

[8] It is worth noting, in passing, that plaintiff does not elaborate on what "fundamental details" he felt were missing, nor how trading information could have strengthened his case. The information truly critical to plaintiff's case -- dates -- require no specialized knowledge.

prosecuted the case without the benefit of those details -- no testimony or any other evidence was offered by the "former colleagues" to whom plaintiff's counsel attributed this information. (Id.). The fact that plaintiff was able to pursue the case reveals that this information was not the sine qua non that plaintiff argues it to have been. Similarly, biding one's time while waiting to obtain medical records cannot be regarded as reasonable diligence. There is no reason why contact with defendant or, indeed, this suit itself could not have been initiated while still waiting for medical records. Indeed, we note that an Adminstrative Law Judge had reached a decision that was fully favorable to plaintiff in September 2008 (see Pl's. Ex. 1), and that it included specific and detailed factual findings with respect to plaintiff's condition. Under these circumstances, plaintiff has offered no compelling explanation for why he failed to pursue the present action within the statutory period.

In sum, plaintiff cannot carry his burden of showing that he acted with reasonable diligence in the period following defendant's denial of his claim. The fact that he was able to take certain self-protective steps during the years following discovery of the denial letter is strongly suggestive; the fact that he has not furnished any evidence to explain why he was able to take those steps but not the step of filing timely suit is decisive.

38

CONCLUSION

Plaintiff has failed to show that extraordinary circumstances during the period he sought to toll prevented him from protecting his rights, nor was he able to show that he pursued his rights with reasonable diligence during or after this period. Accordingly, there is no ground upon which plaintiff's claim may be deemed timely. We therefore recommend that the doctrine of equitable tolling not be applied to preserve plaintiff's untimely claim.

Dated: New York, New York
       October 4, 2012

MICHAEL H. DOLINGER
UNITED STATES MAGISTRATE JUDGE

39

Copies of the foregoing Report and Recommendation have been
mailed today to:

Robert J. Bach, Esq.
Law Offices of Robert J. Bach, Esq.
60 East 42nd Street
40th Floor
New York, New York 10165
Fax: (212) 687-2123

Louis P. DiGaiaimo, Esq.
McElroy, Deutsch, Mulvaney & Carpenter, LLP
1300 Mount Kemble Avenue
P.O. Box 2075
Morristown, New Jersey 07962-2075
Fax: (973) 425-0161

40